ERIKA BIRCH (Idaho Bar No. 7831)
LAUREN I. SCHOLNICK (Idaho Bar No. 7579)
GRANT BURGOYNE (Idaho Bar No. 3846)
**STRINDBERG & SCHOLNICK, LLC**
1516 W. Hays Street
Boise, Idaho 83702
tel: 208.336.1788
fax: 208.278.3708
erika@idahojobjustice.com
lauren@utahjobjustice.com
grant@idahojobjustice.com

*Attorneys for Plaintiff*

IN THE DISTRICT COURT OF THE FOURTH JUDICIAL DISTRICT
OF THE STATE OF IDAHO, IN AND FOR THE COUNTY OF ADA

| | |
|---|---|
| **MIKE NEWELL**, <br><br> Plaintiff, <br><br> vs. <br><br> **FARM BUREAU MUTUAL INSURANCE COMPANY OF IDAHO**, an Idaho corporation; **IDAHO FARM BUREAU FEDERATION, INC**., an Idaho corporation; and, **FARM BUREAU LIFE INSURANCE COMPANY**, an Iowa company; <br><br> Defendants. | **FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** <br><br> Case No. 1:17-CV-00277-DCN <br> Judge David C. Nye |

Plaintiff Mike Newell, by and through undersigned counsel, hereby complains against

Defendants Farm Bureau Mutual Insurance Company of Idaho ("Farm Bureau Mutual"), Idaho

Farm Bureau Federation, Inc. ("The Federation"), and Farm Bureau Life Insurance Company

("Farm Bureau Life") (collectively "Defendants") as follows:

## NATURE OF THE CLAIMS

This suit is brought under Title VII of the Civil Rights Act of 1964 and the Idaho Human Rights Act for religious discrimination and for violations of state law. These claims are based on Defendant Farm Bureau Mutual and the Federation's decision to terminate Mr. Newell's employment because, unlike the majority of Defendants' management team, he did not practice the Mormon religion and/or in order to favor another Agency Manager who was a member of the Mormon Church. Defendants also terminated Mr. Newell without adequate notice in breach of written contracts, without adhering to Defendants Farm Bureau Mutual/the Federation's practice of progressive discipline in breach of implied contract, and in breach of the covenant of good faith and fair dealing. Defendants Farm Bureau Mutual/the Federation also negligently inflicted emotional distress on Mr. Newell. Additionally, Defendants Farm Bureau Mutual/the Federation unlawfully interfered with his contractual relationship with Farm Bureau Life. Defendant Farm Bureau Life further breached its contracts with Mr. Newell by failing to pay all earned commissions and fees. Mr. Newell seeks all available relief including, but not limited to, damages, attorneys' fees, costs, and interest.

## PARTIES

1.     Plaintiff Mike Newell is a citizen of Idaho and resides in Ada County. At all times relevant, he worked for Defendants as either an independent contractor or an employee.

2.     Defendant Farm Bureau Mutual is an Idaho corporation with its principal place of business in Pocatello, Bannock County. Farm Bureau Mutual regularly conducts business in Ada County where it employed Plaintiff.

3.     Defendant Federation is an Idaho corporation with its principal place of business in Pocatello, Bannock County. The Federation regularly conducts business in Ada County.

4.      Defendant Farm Bureau Life is an Iowa corporation with its principal place of business in Des Moines, Iowa. Farm Bureau Life had a contract with Plaintiff to provide service to its policyholders, which business was conducted by Plaintiff and on behalf of this Defendant in Ada County.

5.      Upon information and belief the Federation and Farm Bureau Mutual are a single, integrated employer. Thus, when referring to Farm Bureau Mutual herein it is alleged that liability also flows to the Federation as a single and/or joint employer.  For example, and upon information and belief:

  a.  The Federation created Farm Bureau Mutual for the benefit of its members, and both entities are managed by a single board of directors and thus have common management as well as common ownership and financial control.

  b.  They both share the same physical address and post office box as their principal place of business, and the Federation selects and oversees the CEO for Farm Bureau Mutual. Thus, they have interrelations of operations.

  c.  They share the same Human Resources department/personnel and hence have common control of labor relations.

**JURISDICTION AND VENUE**

6.      This Court has subject matter jurisdiction over Mr. Newell's claims and personal jurisdiction over Defendants under I.C. § 5-514.

7.      Venue is proper with this Court under I.C. § 5-404, as Ada County is the county in which the underlying events took place and the causes of action arose.

8.      The amount in controversy exceeds the jurisdictional amount of ten thousand dollars ($10,000).

## ADMINISTRATIVE PROCEEDINGS

9.     Mr. Newell timely filed a Charge of Discrimination with the Idaho Human Rights Commission ("IHRC") and the United States Equal Employment Opportunity Commission ("EEOC") in August 2015.

10.     On September 30, 2016, the IHRC issued Mr. Newell a Notice of Right to Sue.

## GENERAL ALLEGATIONS

11.     Farm Bureau Mutual hired Mr. Newell as an independent contractor Sales Agent in or around July 1984. He worked as a Sales Agent for 27 years until Defendants Farm Bureau Mutual/the Federation hired him as an employee with the title of Agency Manager on July 1, 2011.

12.     Mr. Newell executed an Agency Manager Agreement with Farm Bureau Mutual.

13.     Defendants Farm Bureau Mutual and Farm Bureau Life had a shared standard practice whereby an Agent or Agency Manager for one served also as an Agent or Agency Manager for the other.

14.     Hence, Mr. Newell also executed several Agent and Agency Manager Agreements with Farm Bureau Life.

15.     It was common practice and expected that an Agency Manager would use the same physical and human resources to fulfill his or her obligations to both the Mutual and Life insurance companies.

16.     Each agreement set forth a variety of terms, including references to Mr. Newell's compensation structure and his employment obligations. They also each required written notice of termination. While the Farm Bureau Life Agency Manager Agreement permitted immediate termination with written notice, the Farm Bureau Mutual Agency Manager Agreement required

10 days' written notice of termination.

17.    Additionally, Mr. Newell's Agreements with Farm Bureau Life entitled him to certain payments, some of which survived termination. For example, several of Mr. Newell's Agent Contracts provide that he shall be paid service fees and/or renewal commissions post-termination, so long as he met certain requirements, which he did.

18.    Since his termination, Mr. Newell has not received these payments. Additionally, upon information and belief, he may not have received all fees and commissions due and owing to him pursuant to those contracts during the length of his employment/contractor status.

19.    During his 27 years as Sales Agent, Mr. Newell earned several performance-related awards and generated over $22 million in premiums for the benefit of Defendants.

20.    During the less than four years that Mr. Newell served as an Agency Manager, he expanded by twenty percent both the agency's property and casualty book of business (equivalent to more than five million dollars) and its number of employed agents. Under his management, the agency also exceeded the company goal for new life insurance premiums by an average of ten percent, producing a total of nearly $1.5 million in premiums.

21.    During this period, further, Mr. Newell's agency always ranked among the top twenty percent of Idaho agencies, and Mr. Newell obtained Agency of the Month recognition eleven times.  Indeed, for each of the six months immediately prior to Mr. Newell's termination, his agency ranked number one in Idaho.

22.    Mr. Newell enjoyed these successes while the management of Farm Bureau Mutual/the Federation was undergoing a sea change, as both the longtime CEO and the Vice President of Marketing and Sales (Mr. Newell's direct supervisor) retired in mid-2014 and early 2015, respectively.

23.     Upon information and belief, prior to these changes in management, three-quarters of the 12-member senior management team were members of the same religion/church, specifically, the Church of Jesus Christ of Latter Day Saints, aka Mormon Church, while one-quarter were not members of that church.

24.     Upon information and belief, after these changes in management, all but one of the 12-member senior management team belonged to the Mormon Church.

25.     Upon information and belief, during this same period, the Mormon religious affiliation of the five Claims Managers also increased drastically. While previously two of the five Claims Managers had been Mormon, during this period that number increased to four of the five.

26.     Ron Leavitt was hired as Vice President of Sales in early 2015 and upon information and belief is a member of the Mormon Church.

27.     Mr. Leavitt hired Jared Biggs, as a new Agency Manager in or around January 2015. Upon information and belief Mr. Biggs is also a member of the Mormon Church.

28.     Mr. Newell has never been a member of the Mormon Church, and was not a member during his employment by Defendants.

29.     While vacationing in a remote location in May 2015, Mr. Newell corresponded with one of his sales agents regarding the possibility that Mr. Newell may have made an error in dividing a book of business between two of his agents. Mr. Newell advised that he would look into it upon his return to work the following week.

30.     While still on vacation, Mr. Newell received an invitation to meet with his supervisor, Vice President of Sales Ron Leavitt, regarding the possible error. Mr. Newell looked forward to the meeting immediately upon his return from vacation in order to learn what, if any,

action had been taken while he was out.

31.     However, when Mr. Newell returned to work on May 26th, Mr. Leavitt cancelled the meeting without explanation and failed to accept or return Mr. Newell's several calls throughout the day.

32.     Although Mr. Leavitt failed to communicate with Mr. Newell that morning, he twice called the complaining sales agent to inquire whether Mr. Newell had yet approached him regarding his concern about the division of the book of business.

33.     After his several unsuccessful attempts to connect with Mr. Leavitt to learn the status of the book of business matter, Mr. Newell met with the concerned sales agent and learned that it remained unresolved. Mr. Newell then reviewed the split, acknowledged that he had made an inadvertent mistake by assigning 100% of two zip codes to one agent rather than 50% each to the two agents, immediately made the correction and ordered new books, and believed the matter resolved. There was no indication from the sales agent that he was anything but satisfied with this result.

34.     That afternoon, Mr. Newell left a voicemail advising Mr. Leavitt that he had resolved the problem.

35.     After a few failed attempts to meet with Mr. Leavitt, Mr. Newell and Mr. Leavitt met the morning of May 28th. Mr. Leavitt was unexpectedly accompanied by David Acevedo, Vice President of Operations and Human Resources.

36.     During the May 28th meeting, Mr. Leavitt confronted Mr. Newell about the split of the book of business. Mr. Newell provided the honest and logical explanation for his mistake and again advised Mr. Leavitt that he had taken corrective measures and that the complaining sales agent was satisfied.

37.     In response, Mr. Leavitt chastised Mr. Newell for not speaking to the sales agent immediately the morning of his return from vacation and instead waiting to do so until that afternoon. Mr. Leavitt advised that he had called the agent on the morning in question and learned that Mr. Newell had not yet reached out to him.

38.     Mr. Newell responded that he had delayed the conversation because he had believed he should first speak with Mr. Leavitt to determine what actions, if any, had been taken about the agent's complaint in his absence. Mr. Newell also inquired why Mr. Leavitt had been able to call the sales agent, but unable to return Mr. Newell's multiple phone calls that morning.

39.     Suddenly and without warning of any sort, Mr. Leavitt announced that Mr. Newell's employment was terminated.

40.     Mr. Newell was in shock. In his 31 years with the company, he had never received a single reprimand, he had always met his goals, and his Agency was consistently a top performer.

41.     Further, Defendants regularly and consistently applied progressive discipline to employees and sales agents in order to manage any concerns about employee performance or misconduct. Such discipline proceeded as follows:

      a.  Issue a written warning and ensure the employee sign and date it for the personnel file;

      b.  Perform a second evaluation in 30 or 60 days to assess improvements versus status quo;

      c.  Provide an employee at least two, often times three, written warnings before they are terminated;

      d.  Provide notice of termination, as required by contract; and

e.  Have a human resource representative present at the time of termination to provide the appropriate paperwork.

42.    For example, Defendants issued a mere written warning to a sales agent who backdated coverage of his family member's vehicle so that the family member unlawfully obtained full coverage for a totaled vehicle, thus committing fraud on the company; and in another instance again issued mere written warnings to an agency manager and a brokerage manager who used business facilities during business hours to participate in a criminal pornographic internet ring.

43.    Following Mr. Newell's termination, Agency Manager Jared Biggs received a substantial portion of what had been Mr. Newell's agency. As a result, Mr. Biggs enjoyed a significant increase in income.

44.    Upon information and belief, just prior to Mr. Newell's sudden and unprecedented termination, Mr. Biggs had raised concerns to management, including but not limited to Mr. Leavitt, about the insufficiency of his level of income.

**FIRST CAUSE OF ACTION**
*(Religious Discrimination in Violation of Title VII and the IHRA against*
*Defendants Farm Bureau Mutual and the Federation)*

45.    Mr. Newell realleges and incorporates by reference all paragraphs set forth above.

46.    Mr. Newell was at all times herein an employee and Defendants were at all times herein employers.

47.    Title VII of the Civil Rights Act, as amended, 42 U.S.C. Section § 2000e *et seq.*, and the IHRA make it unlawful for an employer to discriminate against an employee on the basis of religion.

48.    Mr. Newell has never belonged to the Mormon Church. Specifically, he did not

practice the Mormon faith during the 31 years he provided services to Defendants.

49.    In contrast, Mr. Biggs is believed to have been a member of the Mormon Church.

50.    After terminating Mr. Newell, Defendants gave a substantial portion of what had been Mr. Newell's agency to Mr. Biggs, resulting in significant financial benefits to Mr. Biggs.

51.    Mr. Newell's May 29, 2015 termination, without advance notice and without justification or explanation, was an adverse employment action.

52.    This adverse employment action was taken on the basis of either Mr. Newell's non-affiliation with the Mormon Church, and/or in order to provide favor to Mr. Biggs because he was affiliated with the Mormon Church.

53.    As a proximate result of Defendants' discriminatory conduct, Mr. Newell has been harmed in that he has suffered the loss of wages, salary, and benefits including pension benefits, in an amount according to proof.

54.    As a further proximate result of Defendants' discriminatory conduct, Mr. Newell has been harmed in that he has suffered public humiliation, mental anguish, and emotional and physical distress, and has been injured in mind and body, in an amount according to proof.

55.    Because Defendants' discriminatory conduct was malicious and in reckless and wanton indifference to Mr. Newell's civil rights, Mr. Newell seeks punitive damages under Title VII sufficient to deter Defendants from engaging in similar practices, and to send a clear signal that such intentional and flagrant discrimination will not be tolerated in the State of Idaho.

56.    Mr. Newell also seeks reasonable attorneys' fees and costs.

### SECOND CAUSE OF ACTION
*(Breach of Written Contracts against All Defendants)*

57.    Mr. Newell realleges and incorporates by reference all paragraphs set forth above.

58.    The Farm Bureau Mutual and Farm Bureau Life Agency Manager Agreements

are each enforceable contracts supported by valid consideration.

59.    Farm Bureau Mutual breached its Agency Manager Agreement with Mr. Newell by failing to provide him 10 days' written notice of termination.

60.    Farm Bureau Life breached its Agency Manager Agreement with Mr. Newell by failing to provide him any notice of termination, let alone written notice.

61.    Additionally, Farm Bureau Life breached its Career Agent and Agency Manager Agreements with Mr. Newell by failing to pay him all earned commissions and fees pursuant to those agreements as reflected above.

62.    Mr. Newell is entitled to recover all damages he incurred due to Defendants' breach, including but not limited to lost pay and benefits, interest, attorneys' fees and costs, as well as consequential damages arising from Defendants' breach, and any and all other damages available.

### THIRD CAUSE OF ACTION
*(Breach of Implied Contract against*
*Defendants Farm Bureau Mutual and the Federation)*

63.    Mr. Newell realleges and incorporates by reference all paragraphs set forth above.

64.    Defendants and Mr. Newell each knew of Defendants' pattern and practice of enforcing progressive discipline and intended the same to apply to Mr. Newell's employment in the event that Mr. Newell engaged in misconduct or poor performance.

65.    After Mr. Newell made a minor mathematical error that he remedied within a single day to the satisfaction of the affected sales agent, and although Mr. Newell had never before been disciplined but instead and consistently exceeded goals and achieved high honors throughout his three decades with Defendants, Defendants terminated his employment without application of any progressive discipline.

66.     Defendants' failure to apply progressive discipline with regard to Mr. Newell constitutes a breach of the parties' implied in fact contract.

67.     Mr. Newell is entitled to recover all damages he incurred due to Defendants' breach, including but not limited to specific performance of the promise and reinstatement (or front pay and benefits in lieu of reinstatement), lost pay and benefits, attorneys' fees and costs, as well as consequential damages arising from Defendants' breach, and any and all other damages available.

### FOURTH CAUSE OF ACTION
*(Breach of the Covenant of Good Faith and Fair Dealing against*
*Defendants Farm Bureau Mutual and the Federation)*

68.     Mr. Newell realleges and incorporates by reference all paragraphs set forth above.

69.     The State of Idaho recognizes an implied covenant of good faith and fair dealing in all employment agreements, including employment-at-will relationships.

70.     The employment relationship between Mr. Newell and Defendants included this covenant.

71.     Defendants acted in bad faith and significantly impaired the rights and benefits of Mr. Newell under the employment contract when Defendants terminated Mr. Newell without progressive discipline, warning, explanation, justification, or written notice.

72.     Mr. Newell is entitled to recover all damages he incurred due to Defendants' breach, including but not limited to reinstatement (or front pay and benefits in lieu of reinstatement), lost pay and benefits, attorneys' fees and costs, as well as consequential damages arising from Defendants' breach, and any all other damages available.

## FIFTH CAUSE OF ACTION
*(Intentional Interference with Contract against*
*Defendants Farm Bureau Mutual and the Federation)*

73.     Mr. Newell realleges and incorporates by reference all paragraphs set forth above.

74.     Mr. Newell's Agency Manager contract with Farm Bureau Life remained in effect on May 29, 2015.

75.     Due to Defendants Farm Bureau Mutual's and Farm Bureau Life's shared standard practice of sharing Agency Managers and resources, Farm Bureau Mutual knew about Mr. Newell's contract with Farm Bureau Life.

76.     When Defendants Farm Bureau Mutual and the Federation intentionally terminated Mr. Newell's employment, they interfered with his agreement with Farm Bureau Life because he could no longer provide services or resources to Farm Bureau Life.

77.     As a consequence of Defendants Farm Bureau Mutual's and the Federations' intentional interference and Mr. Newell's resulting breach, Mr. Newell suffered lost pay and benefits, attorneys' fees and costs, emotional distress, and other general damages.

78.     Mr. Newell is entitled to recover all damages he incurred due to Defendants' breach, including but not limited to lost pay and benefits, punitive damages, attorneys' fees and costs, and other general damages.

## SIXTH CAUSE OF ACTION
*(Negligent Infliction of Emotional Distress against*
*Defendants Farm Bureau Mutual and the Federation)*

79.     Mr. Newell realleges and incorporates by reference all paragraphs set forth above.

80.     Defendants had a legal duty to: not violate the IHRA/Title VII; to not breach its contracts with Mr. Newell; to not breach the covenant of good faith and fair dealing; and to exercise ordinary care to prevent unreasonable, foreseeable risks of harm to him.

81.     Defendants breached its duties as set forth above in the preceding causes of action.

82.     As a result of Defendants' actions, Mr. Newell suffered emotional distress.

83.     Defendants' breach of the above mentioned duties are the actual and proximate cause of Mr. Newell's emotional injuries.

84.     Mr. Newell physically manifested his emotional distress in various ways, including but not limited to: anxiety, depression, loss of sleep, and racing heartbeat, and it worsened medical conditions he already had such as his Crohn's disease and high blood pressure.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Newell requests that the Court enter judgment in his favor and against Defendants, and award the following relief:

a.     Back pay and benefits, in amounts to be determined at trial;

b.     Compensatory (emotional distress) and consequential damages;

c.     Punitive damages as allowable;

d.     Reinstatement and/or front pay and benefits in lieu of reinstatement;

e.     Injunctive and/or declaratory relief;

f.     Pre-judgment and post-judgment interest at the highest lawful rate;

g.     An offset for his increased tax burden;

h.     Attorneys' fees and costs of this action, including expert witness fees, as appropriate; and

i.     Any such further relief as justice allows.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

DATED this 20th day of April, 2018.

**STRINDBERG & SCHOLNICK, LLC**

/s/ Erika Birch
Erika Birch
Grant T. Burgoyne
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on April 20, 2018, a true and correct copy of the foregoing pleading was served on the following via electronic filing service:

James L. Martin
Carsten Peterson
Jetta Hatch Mathews
HAWLEY TROXELL ENNIS & HAWLEY LLP
877 W. Main St., Suite 1000
P.O. Box 1617
Boise, ID 83701-1617
*jmartin@hawleytroxell.com*
*cpeterson@hawleytroxell.com*
*jmathews@hawleytroxell.com*

John A. Bailey, Jr.
Carol Tippi Jarman
BAILEY, HAHN & JARMAN PLLC
101 N. Main St.
P.O. Box 790
Pocatello, ID 83204
*jab@bhj-law.com*
*ctj@bhj-law.com*

James S. Thomson, II
W. Dustin Charters
POWERS TOLMAN FARLEY, PLLC
345 Bobwhite Court, Suite 150
P.O. Box 9756
Boise, ID 83707
*jst@powerstolman.com*
*wdc@powerstolman.com*

_____/s/ Dunja Subasic_____
Dunja Subasic